UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
TOWER INSURANCE COMPANY             )
OF NEW YORK,                        )
                                    )
             Plaintiff,        )
                                    )
      v.                            )    Civil Action No. 13-0781 (RBW)
                                    )
DAVIS/GILFORD,                      )
A JOINT VENTURE,                    )
                                    )
             Defendant.        )
_____ )

**MEMORANDUM OPINION**

This case arises from a dispute between the plaintiff, Tower Insurance Company of New York ("Tower"), and the defendant, Davis/Gilford, A Joint Venture ("Davis/Gilford"), regarding Tower's purported obligations under a performance bond issued by Tower guaranteeing work performed under a subcontract executed between Davis/Gilford and Punch Out Specialist Team. Complaint ("Compl.") ¶¶ 13–15, 21. On March 13, 2013, Davis/Gilford instituted arbitration of the parties' dispute. Id. ¶ 19. Tower's Motion to Stay Arbitration ("Pl.'s Mot.") and Davis/Gilford's Motion for Summary Judgment, or In the Alternative, Motion to Dismiss ("Def.'s Mot.") are currently before the Court. After careful consideration of the parties' submissions,[1] the Court concludes that it must deny Tower's motion to stay arbitration and grant Davis/Gilford's motion for summary judgment.

---

[1] In addition to the filings already referenced, the Court considered the following submissions in reaching its decision: (1) the Memorandum of Law in Support of Motion to Stay Arbitration ("Pl.'s Mem."); (2) Davis/Gilford, A Joint Venture's Opposition to Tower Insurance Company of New York's Motion to Stay ("Def.'s Opp'n"); (3) Tower's Reply to Davis/Gilford's Opposition to Tower's Motion to Stay Arbitration ("Pl.'s Reply"); (4) the Memorandum in Support of Defendant Davis/Gilford, A Joint Venture's Motion for Summary Judgment, or In the Alternative Motion to Dismiss ("Def.'s Mem."); (5) Tower's Opposition to Davis/Gilford's Motion for Summary

(continued . . .)

# I. BACKGROUND

The following facts are undisputed unless otherwise noted. Davis/Gilford is the general contractor for the construction of a project known as the Residences at Progression Place, located in the District of Columbia. Pl.'s Mem. at 4 ¶ 1; Def.'s Mem. at 3 ¶ 1. On May 25, 2011, Davis/Gilford entered into a subcontract with Punch Out Specialist Team ("POST") to perform certain work on the project for the amount of $2,281,400.00. Pl.'s Mem. at 4 ¶ 3; Def.'s Mem. at 3 ¶ 2; see also Pl.'s Mem., Exhibit ("Ex.") 1 (Subcontract Agreement between Davis/Gilford, A Joint Venture and POST ("Subcontract")) at 1. The Subcontract contained the following provision ("Disputes Clause"):

> Disputes arising out of Owner acts, omissions, or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise those rights at its sole cost and shall be bound thereby. DAVIS/Gilford, a Joint Venture shall have no direct liability except to give Subcontractor opportunity to exercise rights in the Prime Contract. Disputes with DAVIS/Gilford, a Joint Venture shall be resolved by arbitration in accordance with the rules of the American Arbitration Association and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Disputes shall not interfere with the progress of the job. Work shall proceed as ordered, subject to claim.

Pl.'s Mem. at 11 ¶ 33; Def.'s Mem. at 4 ¶ 3; see also Pl.'s Mem., Ex. 1 (Subcontract) at 4.

On or about June 1, 2012, Tower issued a performance bond guaranteeing POST's work on the project in the amount of $2,281,400.00. Pl.'s Mem. at 10 ¶ 26; Def.'s Mem. at 4 ¶ 6; see also Pl.'s Mem., Ex. 5 (Performance Bond) at 1, 3. The Performance Bond states that the "Subcontract [between Davis/Gilford and POST] is hereby referred to and made a part hereof." Pl.'s Mem. at 12 ¶ 36; Def.'s Mem. at 4 ¶ 7; Pl.'s Mem., Ex. 5 (Performance Bond) at 1. In the event of POST's default on the Subcontract, the Performance Bond provides that "the Surety

---

( . . . continued)
Judgment and Motion to Dismiss ("Pl.'s Opp'n"); and (6) Davis/Gilford, A Joint Venture's Reply in Support of its Motion for Summary Judgment, or In the Alternative, Motion to Dismiss ("Def.'s Reply").

shall within thirty (30) calendar days after notice of default from the Contractor, notify the Contractor in writing of its election either to promptly proceed to remedy the default or promptly proceed to complete the work of the Subcontract in accordance with and subject to its terms and conditions." Pl.'s Mem., Ex. 5 (Performance Bond) at 2; Def.'s Mem. at 5 ¶ 11. Tower now contends that this Performance Bond was obtained through fraud. Pl.'s Mem. at 12 ¶ 37.

On August 13, 2012, Davis/Gilford terminated POST for defaulting on the Subcontract and subsequently notified Tower of POST's default. Pl.'s Mem. at 10 ¶ 28; Def.'s Mem. at 4 ¶¶ 9–10. Tower ultimately elected to complete the work under the Subcontract, Pl.'s Mem. at 11 ¶ 29; Def.'s Mem. at 5 ¶ 12, and the parties subsequently negotiated a written agreement memorializing Tower's election,[2] see Def.'s Opp'n at 9–11 ¶¶ 14–26; Pl.'s Reply, Ex. 1 (Takeover Agreement); see also Pl.'s Opp'n at 7 ¶ 15. The agreement states that "Tower is taking over the Subcontract as if it were the original contracting party and is responsible for, and shall perform all the obligations required by, the Subcontract in accordance with its terms and conditions." Pl.'s Reply, Ex. 1 (Takeover Agreement) at 1. It also provides that "[t]he terms of the Subcontract are incorporated into this Agreement by reference [and that n]othing in this Agreement affects any of the rights and obligations of [Davis/Gilford] or Tower under the terms of the Subcontract or the Performance Bond." Id. at 3. The parties exchanged final drafts of the agreement for signature, but never completed executed copies of the agreement. See Def.'s Opp'n at 11–12 ¶¶ 25–30.

---

[2] Because Tower believes the Takeover Agreement is "irrelevant to the analysis" of the questions before the Court, Pl.'s Reply at 8 n.4, it has not responded to several of Davis/Gilford's factual assertions regarding the negotiation and content of the Takeover Agreement. Tower's arguments regarding the Takeover Agreement effectively concede its existence, see, e.g., Pl.'s Reply at 11 & n.7, however, and Tower has even attached a copy of the Agreement as an exhibit to its reply, Pl.'s Reply, Ex. 1 (Takeover Agreement). Accordingly, the Court considers the factual assertions made by Davis/Gilford that are recounted above to be uncontested.

3

Davis/Gilford filed a Demand for Arbitration against Tower with the American Arbitration Association on March 13, 2013. Pl.'s Mem. at 11 ¶ 30. Tower has participated in the ongoing arbitration proceedings subject to a reservation of its objection to the arbitral tribunal's jurisdiction. Pl.'s Mem. at 11 ¶¶ 31–32.

Tower instituted this suit on May 29, 2013, seeking a declaration from this Court that it "is not required to arbitrate its personal surety claims or defenses of alleged fraud in the inducement in connection with issuance of the performance bond or payment bond" and an injunction "directing Davis/Gilford to refrain from continuing with the [American Arbitration Association] arbitration which purports to determine Tower's alleged fraud in the inducement claims." Compl. ¶¶ 30–41. Tower filed a Motion to Stay Arbitration and a Request for Expedited Hearing that same day. The Court denied Tower's Request for Expedited Hearing, finding that it had not satisfied, or even pled, the requirements for showing entitlement to expedited injunctive relief. ECF No. 7 at 1–2. In conjunction with filing its opposition to Tower's Motion to Stay Arbitration, Davis/Gilford moved for summary judgment or, in the alternative, for dismissal.

## II. LEGAL STANDARD

A motion to compel arbitration pursuant to § 4 of the Federal Arbitration Act ("FAA"),[3] 9 U.S.C. §§ 1–16 (2012), is determined in accordance with the summary judgment standard of Federal Rule of Civil Procedure 56, "as if it were a request for 'summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.'" Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008) (citations

---

[3] Although the parties do not address whether the contracts at issue here fall within the purview of the FAA, both parties have analyzed the issues under the framework of the FAA, and thus, the Court concludes that they agree that the FAA applies here.

4

omitted). While motions to stay arbitration proceedings are not contemplated by § 4, the analysis of a claim for such relief is essentially the same because the argument that "no agreement to arbitrate was entered . . . effectively raises the issue whether there was a meeting of the minds on the agreement to arbitrate." Booker v. Robert Half Int'l, 315 F. Supp. 2d 94, 99 (D.D.C. 2004), aff'd, 413 F.3d 77 (D.C. Cir. 2005). Thus, "the summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). Irrespective of how the motions before the Court are styled, both seek "summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate" requiring Tower to participate in arbitration, and accordingly, the Court shall treat the parties' respective motions as cross-motions for summary judgment.[4] See Aliron Int'l, 531 F.3d at 865.

Federal Rule of Civil Procedure 56 provides that summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the depositions, affidavits, and other factual materials in the record. Fed. R. Civ. P. 56(a), (c). The moving party bears the initial burden of showing the absence of a disputed material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law."

---

[4] Davis/Gilford argues that Tower must satisfy the high standard for obtaining a preliminary injunction in order to prevail on its motion, Def.'s Opp'n at 6–7, 24–29, which would require Tower to establish "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest," Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008). These requirements correspond with what a plaintiff seeking a permanent injunction must show, with the exception that a plaintiff seeking permanent relief must show actual success on the merits, rather than a likelihood of success. See id. at 32 (citation omitted). In response, Tower concedes that it cannot satisfy these requirements, but contends that the Court may grant a stay of arbitration proceedings without considering the elements necessary for granting an injunction. Pl.'s Reply at 16–17. In any event, as discussed below, the Court concludes that Tower's motion must be denied on its merits, and thus, it need not determine whether the standard for a preliminary or permanent injunction is applicable in this particular context.

5

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about facts that are "irrelevant or unnecessary" to the issue at hand do not affect the summary judgment analysis. Id. In determining whether there is a genuine issue of material fact which would preclude summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (citing Anderson, 477 U.S. at 255). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to avoid summary judgment. Anderson, 477 U.S. at 252.

While disputes regarding material facts preclude summary judgment, disputes regarding the application of the law to the undisputed facts do not. See Spark v. Catholic Univ. of Am., 510 F.2d 1277, 1281 (D.C. Cir. 1975); see also United States v. BCCI Holdings (Luxembourg), S.A., 977 F. Supp. 1, 6 (D.D.C. 1997), aff'd, 159 F.3d 637 (D.C. Cir. 1998). The proper interpretation of an unambiguous contract provision is a question of law, and thus is well-suited to disposition by summary judgment. United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 456 F. Supp. 2d 46, 55 (D.D.C. 2006), aff'd, 530 F.3d 980 (D.C. Cir. 2008).

### III. ANALYSIS

The sole issue before the Court is the applicability of the arbitration provision contained in the Subcontract to Tower. See Compl. ¶¶ 30–41; Pl.'s Reply at 2–4. Davis/Gilford argues that Tower is bound by the arbitration provision in the Subcontract as incorporated by both the Performance Bond and the Takeover Agreement, see Def.'s Opp'n at 15 & n.4; Def.'s Mem. at 2, and that, pursuant to the Disputes Clause, the arbitrability of particular disputes must be submitted to the arbitral tribunal, see Def.'s Mem. at 17–19.

Congress's "preeminent concern" in enacting the FAA was to enforce private agreements to arbitrate, "a concern which requires that [courts] rigorously enforce agreements to arbitrate."

6

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625–26 (1985) (citation and quotation marks omitted).  Section 2 of the FAA provides that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  This provision embodies "a liberal federal policy favoring arbitration agreements" under which "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983).  Thus, although "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit," Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (citations and quotation marks omitted), "[the parties'] intentions are generously construed as to issues of arbitrability," Mitsubishi Motors, 473 U.S. at 626.

It is well-established that "the question of arbitrability—whether a [particular] agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination."  AT&T Techs., Inc. v. Comm'cns Workers of Am., 475 U.S. 643, 649 (1986).  Thus, both disputes concerning whether the parties are bound by an arbitration clause and, if so, whether the clause encompasses a specific issue, are questions of arbitrability for a court to decide.  Howsam, 537 U.S. at 84 (citations omitted).  When considering whether the parties have agreed to submit questions of arbitrability of particular disputes to an arbitrator, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakabl[e]' evidence that they did so."  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (citation omitted).

7

A court makes the determination of whether the parties agreed to arbitrate a particular dispute "by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].'" Mitsubishi Motors, 473 U.S. at 626 (citations omitted). State contract law "is applicable to determine which contracts are binding under § 2 [of the FAA] and enforceable under § 3 if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630–31 (2009) (citations and quotation marks omitted); see First Options, 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." (citations omitted)). But to the extent that application of state arbitration law would thwart the FAA's policy favoring arbitration, federal law applies and pre-empts state law. See Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 686–88 (1996). Accordingly, the Court turns first to the question of whether the parties entered into a valid and enforceable arbitration agreement under the applicable federal and state law. See Nelson v. Insignia/ESG, Inc., 215 F. Supp. 2d 143, 149 (D.D.C. 2002) (Walton, J.).

**A. Validity and enforceability of the arbitration provision in the Subcontract**

Davis/Gilford bases its demand for arbitration on the Subcontract's Disputes Clause, which, it contends, is incorporated into both the Performance Bond and the Takeover Agreement by reference, see Def.'s Opp'n at 15 & n.4; Def.'s Mem. at 2, and requires arbitration of any disputes with Davis/Gilford under the plain language of the provision, see Def.'s Opp'n at 12–14; Def.'s Mem. at 2. Although Tower concedes that the Subcontract is expressly incorporated into the Performance Bond it executed, Pl.'s Mem. at 35, Tower argues that the incorporation clause does not evince an intent by the parties to incorporate the Disputes Clause, see id. at 36–

8

45, and that even if it does, the plain language of the provision does not require it to arbitrate its personal surety defenses, id. at 26–28.

Under District of Columbia law,[5] "[w]hen a contract incorporates another writing, the two must be read together as the contract between the parties." Sheriff v. Medel Electric Co., 412 A.2d 38, 41 (D.C. 1980) (citations omitted). In determining the meaning of contractual provisions, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite meaning." Aziken v. Dist. of Columbia, __ A.3d __, __, 2013 WL 3064573, at *4 (D.C. 2013) (citation and quotation marks omitted). "[C]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction," but rather are ambiguous "when, to a reasonably prudent person, the language used in the contract is susceptible of more than one meaning . . . and the court determines that proper interpretation of the contract depends upon evidence outside the contract itself." Id. at __, *4 (citations and quotation marks omitted). To assess whether contractual language is ambiguous, a court must "examine the document on its face, giving the language used its plain meaning." Debnam v. Crane Co., 976 A.2d 193, 197 (D.C. 2009). Once a court has determined that a contractual provision is unambiguous, "the contract's terms . . . provide 'the best objective manifestation of the parties' intent.'" Id. (citation omitted).

---

[5] Although neither party has addressed which state's law governs the Performance Bond and Takeover Agreement, both parties relied on District of Columbia contract and arbitration law in their submissions to the Court. See, e.g., Pl.'s Mem. at 20, 22 (arguing that "basic principles of District of Columbia contract law" support its contention that it did not agree to arbitrate arbitrability); Def.'s Mem. at 23–24 (discussing remedies available to Tower under the District of Columbia Revised Uniform Arbitration Act).

9

The Performance Bond executed by Tower states that the Subcontract "is hereby referred to and <u>made a part</u>" of the Bond. Pl.'s Mem., Ex. 5 (Performance Bond) at 1 (emphasis added). Even though Tower concedes that this language incorporates the provisions of the Subcontract, Pl.'s Mem. at 35, it nonetheless contends that "[t]he clear intent of making the subcontract a 'part hereof' (of the bond) was to supplement the default provisions in the bond agreement so that Tower would be obligated to perform the work according to the subcontract if POST did not," <u>id.</u> at 36. The plain meaning of the contract language simply does not support Tower's interpretation. The Performance Bond states that the Subcontract "is hereby referred to and made a part" of the Bond without any exception or reservation. The Court can discern no other meaning or effect of this language but to include the Subcontract's terms as provisions of the Performance Bond in their entirety. <u>Cf.</u> <u>Wash. Metro. Area Transit Auth. ex rel. Noralco Corp. v. Norair Eng'g Corp.</u>, 553 F.2d 233, 235 (D.C. Cir. 1977) (holding that only provisions "relating to work specifications and performance" were incorporated into the subcontract because the relevant clauses limited the incorporation of the terms "insofar as they relate . . . to the work undertaken herein"). Indeed, "[i]t is generally held that '[w]hen a document incorporates outside material by reference, the subject matter to which it refers becomes part of the incorporating document <u>just as if it were set out in full</u>.'" <u>BP Amoco Corp. v. NLRB</u>, 217 F.3d 869, 874 (D.C. Cir. 2000) (emphasis added) (citations omitted). There is no ambiguity in the incorporation clause, and thus, the Court finds that the plain language of the clause controls, demonstrating Tower's intention to incorporate the provisions of the Subcontract in their entirety.

The Disputes Clause incorporated into the Performance Bond discusses two different types of disputes. The first three sentences of the Clause address "[d]isputes arising out of Owner acts, omissions, or responsibilities," providing that such disputes will be resolved in

accordance with the provisions of the prime contract. Pl.'s Mem., Ex. 1 (Subcontract) at 4. With respect to this type of dispute, the Subcontract states that the "[s]ubcontractor shall have the right to exercise those rights at its sole cost and shall be bound thereby" and that Davis/Gilford has no direct liability under this provision. Id. The following sentence states that "[d]isputes with DAVIS/Gilford, a Joint Venture shall be resolved by arbitration in accordance with the rules of the American Arbitration Association and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof." Id. The Court can find no ambiguity in this language, which plainly requires that disputes with Davis/Gilford be submitted to arbitration without limitation. For example, in John W. Johnson, Inc. v. Basic Construction Co., 429 F.2d 764 (D.C. Cir. 1970), this Circuit considered whether a subcontractor was subject to an administrative disputes process set forth in the prime contract, which was incorporated into the subcontract by reference, concluding that the provision was not applicable, in part, because the disputes clause expressly referred to the respective obligations of the contractor and owner in the provisions outlining the disputes process.[6] See 429 F.2d at 774–75. In contrast, here, the Disputes Clause contains no language expressly limiting the arbitration provision to disputes between Davis/Gilford and POST.[7] And, unlike the first portion of the Clause addressing

---

[6] The court also relied on its interpretation of the incorporation clause in the subcontract, which expressly referred to the incorporation of the prime contract with reference to the "work" to be performed, among other factors. See John W. Johnson, Inc., 429 F.2d at 774–75.

[7] It is for this reason that Tower's reliance on Island Insurance Co. v. NORESCO, LLC, No. 12-499, 2012 WL 6629588 (D. Haw. Dec. 19, 2012), is misplaced. Unlike the Subcontract here, the incorporated arbitration provision in Island Insurance stated that "[c]laims, disputes, and matters in question arising out of or relating to this Agreement as to matters solely between Contractor and Subcontractor" would be resolved through arbitration. 2012 WL 6629588, at *1 (emphasis added). The court there found that the plain language of the contract limited arbitration to matters between the contractor and subcontractor alone, and therefore the arbitration provision was not broad enough to encompass the surety's claims. Id. at *8. Accordingly, based on the above analysis of the Subcontract's language, the Court finds that the reasoning of Island Insurance is not applicable here.

11

"[d]isputes arising out of Owner acts, omissions, or responsibilities," the arbitration provision does not even reference either the subcontractor or POST.

Tower posits that the limitation it advances must be read into the contractual language based on the last two sentences of the Disputes Clause, which state, "[d]isputes shall not interfere with the progress of the job. Work shall proceed as ordered, subject to claim." Pl.'s Mem. at 27–28 (quoting Pl.'s Mem., Ex. 1 (Subcontract) at 4). Tower argues that POST "is the only entity performing work," because "work" is defined in the Subcontract as acts performed by the "subcontractor," which, in turn, is defined as POST. Id. at 28 (quoting Pl.'s Mem., Ex. 1 (Subcontract) at 1). Therefore, in Tower's view, the last two sentences refer exclusively to POST and place the arbitration provision in context as referring solely to POST. Id. at 27–28.

While Tower correctly notes that the Subcontract defines "work" with reference to POST, it misconstrues the effect of these two sentences on the arbitration provision contained in the preceeding sentence. The Court sees no logical reason why the instruction that "[d]isputes shall not interfere" with POST's work on the project necessarily means that the disputes subject to arbitration pursuant to the immediately preceeding sentence must relate solely to POST's performance of the work. Neither use of the term "disputes" in the last three sentences of the Disputes Clause includes any limitation on the parties involved or the subject matter of the disagreement. And while Tower is correct that ambiguities in contractual language are construed against the drafter—in this case, Davis/Gilford—this presumption only applies once a court has identified an ambiguity. Affordable Elegance Travel, Inc. v. Worldspan, L.P., 774 A.2d 320, 328 (D.C. 2001) (citations omitted). The Court discerns no ambiguity in this provision "merely because the parties disagree over its meaning or could have drafted clearer terms." Thermal Dynamics Int'l, Inc. v. Safe Haven Enters., LLC, __ F. Supp. 2d __, __, 2013 WL 3379306, at *4 (D.D.C. 2013) (citation omitted). The plain meaning of the last three sentences of the

Disputes Clause is just what the language already states: any dispute with Davis/Gilford must be submitted to arbitration, and work on the project shall proceed notwithstanding any disputes that may arise.

As support for its position, Tower relies heavily on the reasoning of Fidelity & Deposit Co. of Maryland v. Parsons & Whittemore Contractors Corp., 397 N.E.2d 380 (N.Y. 1979), and cases adopting a similar position. See Pl.'s Mem. at 36–45. However, Parsons & Whittemore is not analogous to the circumstances here. In that case, the New York Court of Appeals considered whether a surety was required to arbitrate its disputes with a prime contractor because the performance bond stated that the subcontract which the bond guaranteed "is by reference made a part hereof," and the subcontract contained a provision which stated that "[a]ll disputes arising out of this Contract, its interpretation, performance or breach, shall be submitted to arbitration . . . ." 397 N.E.2d at 381. Reasoning that disputes regarding the surety's obligations under the performance bond were not "disputes arising out of" the subcontract, the New York court determined that the only effect of the incorporation clause with respect to arbitration was to bind the surety to the resolution of any arbitration involving the contractors. Id. at 382–83. In contrast, the contractual language at issue here succinctly states that "[d]isputes with DAVIS/Gilford, a Joint Venture shall be resolved by arbitration," Pl.'s Mem., Ex. 1 (Subcontract) at 4, and thus no distinction between "disputes arising out of" the subcontract and disputes such as those regarding the surety's obligations which do not arise out of the subcontract can be inferred, a "critical distinction" on which the New York court based its conclusion that the arbitration provision did not encompass the surety's claims, see Parsons & Whittemore, 397 N.E.2d at 382–83. Another court which adopted this position based its reasoning on similar contractual language. See Gloucester City Bd. of Educ. v. Am. Arbitration Ass'n, 755 A.2d 1256, 1261–63 (N.J. Super. Ct. App. Div. 2000).

13

To the extent, as argued by Tower, that these and the other cases cited by Tower stand for the proposition that a surety generally cannot be required to arbitrate its claims pursuant to an incorporated arbitration provision in the subcontract, this Court must respectfully disagree with that position. Indeed, a majority of federal circuit courts of appeals, including the First, Second, Fourth, Fifth, Sixth, Seventh, Tenth, and Eleventh Circuit Courts of Appeals, considering contractual language similar to that at issue in Parsons & Whittemore, have concluded that a surety is bound by an arbitration provision in a prime- or subcontract that is incorporated by reference into a performance bond. See, e.g., Jewish Fed'n of Greater New Orleans v. Fid. & Deposit Co. of Md., No. 01-30371, 2001 WL 1085096, at *1–2 (5th Cir. Aug. 29, 2001); Kvaerner ASA v. Bank of Tokyo-Mitsubishi Ltd., New York Branch, 210 F.3d 262, 265 (4th Cir. 2000); Gingiss Int'l, Inc. v. Bormet, 58 F.3d 328, 331–32 (7th Cir. 1995); Commercial Union Ins. Co. v. Gilbane Bldg. Co., 992 F.2d 386, 388–89 (1st Cir. 1993); U.S. Fid. & Guar. Co. v. West Point Constr. Co., 837 F.2d 1507, 1508 (11th Cir. 1988) (per curiam); Exch. Mut. Ins. Co. v. Haskell Co., 742 F.2d 274, 276 (6th Cir. 1984) (per curiam); Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A., 527 F.2d 966, 973–74 (2d Cir. 1975), abrogated on other grounds by, Gov't of United Kingdom of Great Britain & Northern Ireland v. Boeing Co., 998 F.2d 68 (2d Cir. 1993); see also Nat'l Am. Ins. Co. v. SCOR Reinsurance Co., 362 F.3d 1288, 1291–92 (10th Cir. 2004). As already discussed above, the contractual language at issue here is even broader. The plain language of the Performance Bond and Subcontract indicates that Tower is bound to the arbitration provision in the Disputes Clause, and the Court finds no reason to depart from this result.[8]

---

[8] Because the Court concludes that the Performance Bond binds Tower to the arbitration provision in the Subcontract's Disputes Clause, it need not address Davis/Gilford's arguments that Tower is bound to the arbitration provision due to its election to complete the work under the Subcontract after POST was terminated from the project pursuant to either the Subcontract or the Takeover Agreement. See Def.'s Mem. at 9–11; Def.'s Opp'n at 17–19. In

(continued . . . )

## B. Arbitrability of particular disputes

Tower argues that even if it is bound to arbitrate some of its disputes pursuant to the Disputes Clause, the arbitration provision does not encompass its defense that Davis/Gilford fraudulently induced it to issue the Performance Bond. See Pl.'s Mem. at 33–35; Pl.'s Opp'n at 18–20. Pursuant to Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395 (1967), and its progeny, the Court finds that Tower must arbitrate this defense. In Prima Paint, the Supreme Court held that the FAA does not permit a court to determine whether a contract containing an arbitration provision was fraudulently induced and therefore void. 388 U.S. at 403–04. The Court distinguished claims of fraudulent inducement with respect to the arbitration provision itself, reasoning that such a claim "goes to the 'making' of the agreement to arbitrate" and thus could properly be resolved by a court as part of its determination of whether an agreement to arbitrate exists between the parties. Id. Here, Tower concedes that its allegations of fraud concern the issuance of the Performance Bond in its entirety, not the arbitration provision itself, Pl.'s Opp'n at 10, but argues, without citation to any legal authority, that Prima Paint is not applicable because Tower is a "non-signatory" to the Subcontract, id. at 10–11; Pl.'s Mem. at 39–40. As the Court has already concluded, the Subcontract was incorporated into the Performance Bond, thus "'becom[ing] part of the incorporating document just as if it were set out in full,'" BP Amoco Corp., 217 F.3d at 874 (emphasis added) (citations omitted), and therefore Tower's claim of fraudulent inducement necessarily includes the provisions of the Subcontract, as provisions of the Performance Bond, as well. The distinction between "signatories" and "non-signatories" is thus illusory in this context.

---

( . . . continued)
any event, as Tower itself notes, the Takeover Agreement incorporates the Subcontract, and therefore "the analysis . . . is exactly the same." Pl.'s Reply at 5.

15

Tower further asserts that submission of its fraudulent inducement claim to an arbitrator is "illogical" because "if a bond is void ab initio, then it never existed, and never incorporated the subcontract or the arbitration clause by reference in the first place." Pl.'s Mem. at 44–45. In reaffirming the Prima Paint rule only several years ago, the Supreme Court acknowledged that under this rule, a party may be forced to participate in arbitration pursuant to a contract that an arbitrator later finds to be void. Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 448–49 (2006). The Court nonetheless noted that "it is equally true that [the opposing] approach [would] permit[] a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." Id. The Court then reiterated that "Prima Paint resolved this conundrum—and resolved it in favor of the separate enforceability of arbitration provisions." Id. at 449. Accordingly, the Court concluded: "We reaffirm today that . . . a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." Id. This logic applies with equal force here.[9]

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Tower is required to arbitrate its fraudulent inducement defense pursuant to the Disputes Clause of the Subcontract, incorporated by reference into the Performance Bond issued by Tower. Accordingly, Tower's motion to stay arbitration is denied, and Davis/Gilford's motion for summary judgment is granted.

**SO ORDERED** this 6th day of September, 2013.[10]

REGGIE B. WALTON<br>United States District Judge

---

[9] Tower does not ask this Court to adjudicate the arbitrability of any claim or defense other than its fraudulent inducement of the Performance Bond defense, and so this Court finds it unnecessary to determine whether, as Davis/Gilford argues, Tower agreed to arbitrate the arbitrability of particular claims or defenses because the Disputes Clause references the rules of the American Arbitration Association. See Def.'s Mem. at 17–19.

[10] An order consistent with this memorandum opinion shall be issued contemporaneously.